ESTATE OF HAROLD C. SCHOTT, DECEASED, HOWARD J. VANDEN EYNDEN AND L. THOMAS HILTZ, CO-EXECUTORS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Schott v. Commissioner
Docket No. 5283-78.
United States Tax Court
T.C. Memo 1982-222; 1982 Tax Ct. Memo LEXIS 528; 43 T.C.M. (CCH) 1188; T.C.M. (RIA) 82222; April 26, 1982. *528 The top management employees of the Evendale operations of Avco sought to purchase that operation. The primary source of income of Evendale was from the manufacture and sale of high technology components to the U.S. Government. In order to effect the purchase, the employees organized CEC. The purchase could not be consummated without providing performance bonds covering the government contracts. After extensive negotiations, Harold Schott, an unrelated party, agreed to provide collateral for the performance bonds, to purchase and lease back the land and buildings of Evendale, to acquire a substantial block of stock of CEC for cash, and to provide a line of credit of $ 500,000. CEC paid Schott cash of $ 90,000, issued an option to purchase stock warrants and agreed to redeem Schott's stock at Schott's option at an agreed price between 18 and 30 months after closing. The arrangement with Schott provided the necessary capital for CEC to acquire the Evendale operation and provided the capital necessary for CEC to carry on Evendale's business. After the purchase, CEC prospered and it redeemed Schott's stock at the agreed price before the 18-month period elapsed. Schott exercised *529 his option to purchase the warrants. Schott reported the gain from redemption of his stock as capital gain but CEC allocated most of the redemption cost to Schott's option to have his stock redeemed and CEC amortized it as performance bond expense. Held, the agreements between Schott and CEC were at arm's length; the form of the agreements coincides with its economic substance; and Schott is entitled to report the gain from redemption as capital gain. Carter Bledsoe,Thomas F. Allen,Eric M. Oakley and Frederick L. Fisher, for the petitioner. Carolyn M. Parr, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE: Judge: The Commissioner determined deficiencies in the decedent's Federal income taxes in the amount of $ 508,200 for the taxable year 1973 and $ 306,641.56 *530 for the taxable year 1974. The respondent, in two amendments to his Answer, claimed increased deficiencies and raised additional issues and theories. The following issues are presented for our decision: 1. To what extent, if any, did the decedent realize ordinary income either upon receipt of the option to have his stock in CEC redeemed or upon the redemption of his stock? 2. Did the decedent realize ordinary income as a result of his purchase and leaseback of the land and buildings used by CEC? 3. To what extent, if any, did the right to purchase warrants to purchase stock or the subsequent transfer or redemption of such warrants result in the realization of income to the decedent? FINDINGS OF FACT Some of the facts are stipulated. The stipulations of facts and stipulated exhibits are incorporated herein by this reference. Harold C. Schott timely filed his individual Federal income tax returns for the taxable years 1973 and 1974, during which time he resided in Lakewood, Ohio. Harold J. vanden Eynden and L. Thomas Hiltz, the personal representatives of the Estate of Harold C. Schott, were fiduciaries with legal residence in Cleveland, Ohio, at the time they filed *531 the petition in this case. A statutory notice of deficiency for the taxable years 1973 and 1974 was mailed to petitioner on March 1, 1978. The Commissioner, for protective reasons, asserted deficiencies in his statutory notice for the same adjustment in both 1973 and 1974 but concedes that petitioner is taxable in only one of the two years. On April 13, 1978, petitioner filed an amended Federal income tax return with respect to Mr. Schott's 1974 tax liability for the purpose of protecting itself from double taxation in the event that all or part of the 1973 deficiency is sustained. CEC is an Ohio corporation which was organized on September 13, 1972. It was organized for the purpose of acquiring all of the assets and business of the Evendale operation of the Avco Electronics Division ("Evendale") of Avco Corporation ("Avco"). CEC was organized by George Mealey, Raymond Rack, Allan Murray, Donald Huckins and J. J. King (collectively, the "Organizers"). At the time CEC was organized, each of the Organizers was a management employee of Evendale. Mealey was General Manager of Evendale. He was also Chairman of the Board, President, and Chief Executive Officer of CEC. Rack *532 was Controller of Evendale and was also Executive Vice President of Finance and Treasurer of CEC. Huckins was Director of Finance for Evendale and was also Controller for CEC. Evendale was engaged in the business of designing and producing electronic equipment in a broad variety of product areas, including ground and airborne tactical communications equipment, space electronics, radar and infrared systems, and electronic countermeasures hardware. The vast majority of Evendale's products were produced for the United States Government pursuant to contracts with the Department of Defense. By letters dated August 23, 1972, and September 18, 1972, the Organizers agreed in principle to purchase, and Avco agreed in principle to sell, the assets and business of Evendale at a price equal to the net book value of Evendale (as shown on a balance sheet of Evendale prepared as if Evendale were a separate corporation) as of November 30, 1972. On October 7, 1972, the Organizers transferred to CEC their rights in the agreement with Avco, and in certain commitments relating to the financing of the purchase of Evendale, in exchange for 54,000 shares of CEC class B common stock. When the purchase *533 and sale of Evendale was not completed by November 30, 1972, the date for determining the purchase price was amended to the date of closing of the purchase and sale (the "Closing Date"). Avco's agreement to sell the assets and business of Evendale was conditioned upon successful negotiation of a definitive agreement and approval of that agreement by the boards of directors of Avco and CEC. Avco requested that, prior to commencement of negotiations on such a definitive agreement, the Organizers provide assurance (a) that they had made arrangements in principle for sufficient financing to complete the proposed purchase and to carry on the business of Evendale and (b) that appropriate novation (transfer of responsibility for performance) arrangements satisfactory to Avco could be arranged with the principal customers of Evendale. The Organizers were persons of limited financial means and anticipated being able to raise, among themselves and other Evendale employees, a starting equity capital for CEC of $ 500,000 to $ 650,000. The Organizers estimated that the purchase price for Evendale would be approximately $ 10 million. Potential or actual participants in the financing of *534 the Evendale acquisition by CEC were provided with copies of a "Blue Book." The book outlined CEC's proposed financing plan and included pro forma statements of CEC's condition after the acquisition. This Blue Book was revised and updated periodically. By November 10, 1972, the Organizers had obtained the following outside financial commitments to provide CEC's estimated required starting equity and the estimated purchase price for Evendale. Source
Amount
Type
Chandler Leasing Division
$ 1,000,000
Sale/Leaseback of Machinery
of PepsiCo Leasing Corp.
and Equipment
Sidney Meyers & Associates
$ 3,410,000
Sale/Leaseback of Land and
Buildings
Commercial Credit Business
$ 4,500,000
Factoring of Accounts
Loans, Inc./First National
Receivable and Inventory
Bank of Cincinnati
J. E. McDonald, Jr.
$ 318,275
Sale of Mortage Note
First National Bank of
$ 460,000
Short Term Credit
Cincinnati
$ 9,688,275
The agreement with Avco required the Organizers to arrange for satisfactory novation of Evendale's contracts with the United States Government, the principal customer of Evendale. Novation of United States Government defense contracts is *535 governed by the Armed Services Procurement Regulations. In the case of CEC's purchase of Evendale, these regulations required either that Avco remain secondarily liable for performance of the contracts or that CEC post performance bonds in an appropriate amount. Avco refused to remain secondarily liable for CEC's performance, thereby necessitating that CEC obtain performance bonds. CEC encountered great difficulty in obtaining the required performance bonds. CEC employed, among others, Thomas Klinedinst ("Klinedinst"), President of Thomas E. Wood, Inc., an insurance agency, to obtain the required performance bonds. Mr. Klinedinst was an agent of United States Fidelity and Guarantee Company ("USF&G"), a surety company. When Mr. Klinedinst contacted USF&G concerning performance bonds, the immediate reaction of the surety company was that CEC was too thinly capitalized. Mr. Klinedinst contacted a number of other surety companies in his search. Several companies explained that they were not interested because it was a one-shot deal, that is, there would not be a continuing relationship requiring bonds. Other surety companies indicated that they had already rejected CEC before *536 and that they would not reconsider their decisions. Based upon his conversations with USF&G, Mr. Klinedinst believed the performance bonds would be issued if additional equity capital were contributed to the corporation. The Organizers, therefore, began in late October, 1972, to explore the possibility of raising an additional $ 750,000 of equity capital and obtaining a letter of credit of equal amount from the First National Bank of Cincinnati (the "Bank"), both of which could be posted as security with any surety company willing to issue performance bonds. On October 23, 1972, Mealey met with Vincent Crisci, President of the Whitehall Group, Inc. (a corporate development firm specializing in venture capital, private placements, mergers, acquisitions, and divestitures), to discuss possibilities for raising the additional equity capital through a private placement. In late November or early December, 1972, without informing the Organizers, Klinedinst contacted Schott regarding CEC. Klinedinst had known Schott for a number of years because his insurance agency did a substantial amount of business with Schott's interests. Klinedinst contacted Schott because he had determined *537 that, based on CEC's then existing financing plans and capabilities, it would be impossible to obtain the required performance bonds. Klinedinst described CEC's need to Schott as greater equity capital. They did not discuss collateralization of the performance bonds because Klinedinst believed that the reluctance of the surety company would be overcome with the infusion of additional equity capital. Schott asked Klinedinst for his personal assessment of the Organizers, the possibilities and pitfalls in the contracts CEC would acquire from Evendale, the reasons behind the performance bond requirement, the exposure that a performance bond would entail, and the events which could trigger a loss on the performance bonds. Schott's first direct contact with the Organizers occurred on December 28, 1972. This first meeting was arranged by Harold Kling, a Cincinnati real estate broker, as an inspection tour of Evendale's land and buildings. After the inspection tour, the parties met in the board room which was part of Mr. Mealey's office. Those present were Schott, Mealey, Kling, Jay Eckert (an associate of Schott), Marty Byrnes (an associate of Schott) and Jerry King, one of the Organizers. *538 At this meeting Mealey indicated to Schott that CEC needed a total of $ 9.8 million to purchase Evendale from Avco, an additional $ 1 million for working capital, and performance bonds for the novated contracts. Schott indicated that he was interested in purchasing and leasing back the land and buildings and that, as CEC was looking for additional equity, he was also interested in acquiring enough CEC stock that he might be able to realize a sizable capital gain within a few years. Because CEC was a very high-risk, high-leverage situation, Schott also wanted voting control of CEC. At the same time that the Organizers were negotiating with Schott, they were also exploring other possibilities for restructuring the financing of CEC in order to solve the bonding problem. One of those possibilities involved Narragansett Capital Corporation ("Narragansett"). Among other things, the proposal submitted by Narragansett to Mealey called for Narragansett and the Organizers to each own 50 percent of CEC's voting stock. This proposal would have permitted the Organizers subsequently to acquire additional stock, but such additional stock would have been non-voting. Another of those possibilities *539 involved LaPointe Industries, Inc. ("LaPointe"). LaPointe's proposal called for a merger of LaPointe and CEC immediately after the purchase of Evendale, with the shareholders of LaPointe having control of the combined entity after the merger. A specific goal of the Organizers was to have voting control of CEC. Negotiations between Mealey and Schott continued after the initial meeting until January 7, 1973. During these negotiations, Mealey, Klinedinst, and Schott discussed various alternative forms for a $ 500,000 capital investment in CEC by Schott, which Klinedinst believed was necessary to satisfy the surety company. These alternatives included convertible debentures, preferred stock, and common stock. These negotiations of necessity required that their resolution meet with the approval of USF&G. USF&G was the only surety company that indicated any willingness to work out a reasonable performance bond arrangement with CEC. USF&G did not indicate to Klinedinst what changes in CEC's financial structure would be necessary for it to agree to issue the bonds but instead reacted, favorably or unfavorably, to proposed changes developed by the Organizers and communicated to Klinedinst. *540 Mealey and Klinedinst were the primary movers in suggesting alternative forms for Schott's participation in CEC which might prove acceptable to USF&G. Schott would then react to their suggestions. USF&G rejected all forms of Schott's investment in CEC except his purchase of common stock. On January 3, 1973, Avco notified the Organizers that it was terminating negotiations on the sale of Evendale as of the opening of business on Monday, January 8, 1973, unless all substantive problems in the transaction were resolved to Avco's satisfaction by that time. Mealey called Schott's associate, Jay Eckert ("Eckert"), and told him that if an agreement were to be reached with Mr. Schott it would have to be done before 8:00 Monday morning. Eckert then talked to John McDowell ("McDowell"), CEC's attorney, who drafted an agreement and gave it to Eckert on January 6th. The parties met the following day, Sunday, January 7th, at the home of one of Schott's relatives, Marge Schott. The major participants at the meeting were Mealey, Schott, Eckert, and McDowell. Later Klinedinst and others were called. The parties had previously considered an arrangement whereby Schott would purchase class *541 A stock and would have the right to cause CEC to redeem this stock at a set price during a certain period of time in the future. At the meeting, Schott requested that the redemption price at which his shares could be redeemed by CEC be increased to $ 1,300,000 from $ 1,000,000, to which Mealey agreed. By the end of the meeting, Schott and Mealey reached an agreement on Schott's participation in the CEC acquisition of Evendale. Under this agreement Schott would provide the necessary capital but would receive only a minority voting interest in CEC. Two memoranda of understanding were executed at the meeting. In final form, they provided that: (a) Schott would fully collateralize, in a form satisfactory to the surety company, the performance bonds required to effect novation of Evendale's government contracts. The projected amount of the performance bonds was approximately $ 7.5 million. CEC would pay the premiums on the performance bonds. (b) Schott would purchase the land and buildings (being acquired from Evendale) for $ 3 million and would lease them back to CEC for a period of 20 years under a net-net lease [1] yielding a 12-percent annual return on the purchase price. *542 The lease would provide that Schott could sell (free from CEC's leasehold interest) that part of the land (approximately 39 acres) which was not being used in Evendale's operations as of the Closing Date. (c) Schott would purchase 16,667 shares of CEC common stock at a price of $ 30 per share (total price: $ 500,010). (d) CEC would grant Schott an option (the "Option"), exercisable between the 18th and 30th months after the Closing Date, to require CEC to redeem all or any portion of his shares at $ 78 per share. The Option applied only with respect to his shares and the Option was not transferable by Schott. (e) Schott would provide a secondary line of credit in the amount of $ 500,000 to CEC for a period not to exceed 24 months, with interest at 1 percent over the prime rate. CEC would use its best efforts to increase the Bank's commitment to provide short-term credit from $ 500,000 to $ 1,000,000. (f) Schott and Eckert would be elected as two of the seven members of CEC's *543 Board of Directors and would continue in that capacity until the last to occur of (1) expiration or termination of the performance bonds which Schott had collateralized or (2) expiration of the Option. (g) CEC would provide an office for use by Schott and Eckert, part-time secretarial assistance to Schott and Eckert, a car for use by Eckert, and reimbursement of actual expenses incurred by Schott and Eckert on CEC business (up to $ 2,000 per month). After being shown at least one of the memoranda of agreement, but possibly unaware of the Option aspect of the agreement, Klinedinst then wrote a letter dated January 7, 1973, which was typed at Marge Schott's house. The letter states that, based upon the agreement which had been shown to Klinedinst, insuring full collateralization (in a form satisfactory to the surety company) of all required performance bonds, Klinedinst's agency would arrange for a surety company to issue the bonds. After the agreements were signed, Schott wrote out a check for $ 500,000 and gave it to Mr. Klinedinst. In addition to his position as president of Thomas E. Wood Insurance Co., Klinedinst was also a director of the Bank, and he agreed to deposit *544 the check first thing the following morning. The following morning Mealey telephoned James R. Kerr, President of Avco. Mealey and McDowell read to Mr. Kerr, Klinedinst's letter and the memorandum of agreement with Schott. After checking with the Bank to ascertain that Schott's check had been deposited, Kerr called back to confirm that the sale would go through. On January 8, 1973, Avco agreed to guarantee all "cost-plus" type contracts. On or about January 18, 1973, an updated Blue Book was prepared. This Blue Book reflected the participation of Schott in the CEC acquisition of Evendale. The pro forma financial statements in the January 18, 1973, Blue Book did not reflect any change (from those in the previous Blue Book of December 11, 1972) either in CEC's projected gross earnings for 1973 ($ 2,005,000) or in its projected state and Federal income tax liabilities for 1973 ($ 837,000) as a result of Schott's participation in the CEC-Evendale acquisition. The pro forma financial statements in the January 18, 1973, Blue Book projected after-tax earnings for CEC during 1973-1975 of approximately $ 1 million per year. Mealey projected that CEC's stock would be valued at a price/earnings *545 ratio of 10 in 1974-1975. Based on projected earnings of $ 1 million per year and projected price/earnings ratio of 10, Mealey expected that CEC's stock would have an aggregate value of approximately $ 10 million in 1974-1975. The Shares to be purchased by Schott represented approximately 17 percent of the common stock of CEC as of the Closing Date. Based on an expected aggregate value of $ 10 million for CEC's stock, Mealey expected the Shares would have a value of approximately $ 1.7 million in 1974-1975. Mealey believed that the Option, pursuant to which CEC could be required to redeem the Shares for approximately $ 1.3 million, was a good financial deal for CEC. After the agreement was reached on January 7, 1973, negotiations on the performance bonds began. USF&G indicated that it would accept as security for the bonds either collateral or a personal indemnity from Schott. Klinedinst advised Schott to post collateral rather than act as an indemnitor because, so long as the collateral required was less than 100 percent, Schott would incur less risk with collateral. On January 9, 1973, Mealey, Klinedinst, and Schott met in Klinedinst's office. At that meeting, Schott *546 was extremely angry because USF&G had indicated that it would require 100 percent collateral. That requirement far exceeded the amount that Schott had been led to believe would be necessary in order to obtain the performance bonds. After the January 9, 1973, meeting, Klinedinst contacted USF&G to get the collateral requirement reduced. He indicated to USF&G that Schott would be monitoring CEC's finances and its performance on the contracts covered by the performance bonds. He also indicated that Schott had the financial and operational abilities and contacts to step into the situation if CEC appeared headed for default. On the basis of this information, USF&G agreed to reduce the collateral requirement to 50 percent. The Closing Date was originally scheduled for March 8, 1973. On March 7, 1973, L. Thomas Hiltz, an attorney for Schott, telephoned John McDowell, an attorney for CEC, and informed him that an agreement as to an amount to be paid Schott for collateralizing the performance bonds had to be reached before the scheduled closing could go forward. CEC was to pay USF&G a premium of $ 65,000. After heated negotiations, it was agreed that Schott would be paid $ 90,000 *547 in installments ($ 30,000 on the Closing Date and $ 10,000 per month for six months thereafter) and would be granted the right to purchase stock warrants (the "Warrants") at $ .10 per Warrant. Each Warrant entitled Schott to purchase, for a period of five years, one share of CEC class A common stock at an exercise price of $ 30 per share. Similar warrants were purchased by almost all of the shareholders. Schott assigned the right to purchase 200 of the Warrants to Howard J. vanden Eynden ("vanden Eynden"), a business associate. On March 9, 1973, the purchase of Evendale by CEC was closed. The purchase price, determined under the formula provided in the agreement of purchase, was $ 9,270,001.13, which was paid in cash at the closing. The shareholders of CEC as of the Closing Date were as follows: Equity Holdings
Total
Name
Class A
Class B
Warrants
Investment
Mealey
6,666
33,232
5,000
$ 200,480.00
Rack
5,000
17,372
1,000
150,100.00
Murray
1,666
1,511
49,980.00
Huckins
833
755
24,990.00
King
1,250
1,130
500
37,550.00
Other current or former
3,665
4,233
110,373.30
CEC employees
Schott
16,667
466
500,056.60
vanden Eynden
200
20.00
35,747
54,000
11,399
$ 1,073,549.90
*548 Each shareholder paid $ 30 per share for class A common stock, no cash consideration for class B common stock, and $ .10 per warrant for warrants to purchase class A common stock. CEC's class A and class B common stock were identical except that the class A common stock was entitled to a $ 35 per share liquidation preference and that no cash dividends could be declared on the class B common stock. The class B common stock was convertible into class A common stock in accordance with a formula based on the accumulated earnings of CEC. The certificates issued to Schott to evidence the Shares were identical to all other certificates evidencing CEC class A common stock. Schott's purchase of the Shares was carried on the books of CEC as equity capital. CEC's initial financing sources, which were used to meet the purchase price for Evendale and to provide working capital for the conduct of CEC's business, were as follows: Source
Amount
Type
Chandler Leasing Division of
$ 1,000,000
Sale/Leaseback of Machinery
PepsiCo Leasing Corp.
and Equipment
Schott
$ 3,000,000
Sale/Leaseback of Land
and Buildings
Commercial Credit Business
$ 3,987,000
Factoring of Accounts Receivable
Loans, Inc.
and Inventory
Industrial National Bank of
$ 383,000
Sale of Mortgage Note
Providence, Rhode Island
Organizers and current or
[1] $ 572,400
Private Equity
former employees of CEC
Schott
[1] $ 500,010
Private Equity
First National Bank of
$ 500,000
Secured Line of Credit
Cincinnati
Schott
$ 500,000
Unsecured Secondary Line
of Credit
*549 As of the Closing Date, the land and buildings acquired by CEC had a net book value, on the books of Evendale, of approximately $ 1.7 million. The conveyance of the land and buildings by general warranty deed from Avco to CEC and the conveyance by general warranty deed by CEC to Schott were simultaneous. Schott's $ 3,000,000 purchase price for the land and the buildings was wired directly to Avco to meet the cash purchase obligation of CEC. Schott's purchase and leaseback of the land and buildings were evidenced by a purchase agreement, a deed, a receipt for the purchase price, a lease, a memorandum describing the terms of the lease, and a landlord's waiver permitting Chandler Leasing to have its equipment on the property. This arrangement is known as a "straight pass-through sale/leaseback arrangement" whereby CEC acquired all of the assets, including the real estate, business, and contracts of Evendale, and then passed the land and buildings through to the ultimate owner and lessor, Schott. Schott provided a secondary line of credit in the amount of $ 500,000 with interest at 1 percent over prime, i.e., 7.25 *550 percent. This was the same rate of interest as the rate charged by the Bank on its line of credit to CEC. As finally determined, the total amount of performance bonds required by the government on novated contracts was $ 6,500,000. Schott provided collateral for these bonds in the total amount of $ 3,250,000. As a further condition of the issuance of these bonds, USF&G required Mealey, Rack, and Murray to become jointly and severally obligated with CEC for any loss arising by reason of CEC's default in performance on the contracts covered by the performance bonds. With respect to five contracts with nongovernmental customers of Evendale, CEC arranged with the Bank to issue a letter of credit in favor of Avco in the amount of $ 200,000 to secure CEC's performance of these contracts. Additionally, Schott agreed to provide collateral in favor of Avco as security for CEC's performance on the contracts in the aggregate amount of $ 425,000. Schott thus provided total collateral of $ 3,675,000. Both types of collateral posted by Schott were initially provided in the form of letters of credit issued by the Bank. These were subsequently replaced by certificates of deposit held *551 by the Bank on behalf of USF&G. Interest on the certificates of deposit accrued for the benefit of Schott. All of the minority shareholders had repurchase agreements with CEC. The terms of these agreements, other than the Schott repurchase agreement, are not entirely clear. These agreements with the minority shareholders other than Schott appear to provide that CEC would pay the minority shareholders the greater of $ 30 a share or book value, and that if the minority shareholder wanted to sell to an outsider, CEC had an option period during which it could purchase the stock by matching the outside offer. The repurchase agreement of Schott, who was also a minority shareholder, differed from the above description and complied with the terms bargained for at the January 7, 1973, meeting. Schott's repurchase agreement became effective on March 9, 1973, the date on which he actually acquired his shares, so that the time for exercising his Option began to run on that date. On May 15, 1973, a special meeting was held of the shareholders of CEC. At that special meeting, a "Summary of Closing of the Purchase of the Evendale Operation and Related Transactions on March 9, 1973" was *552 distributed to all shareholders. The Summary was prepared and distributed on advice of CEC's legal counsel. The purpose of the Summary was to protect CEC from liability under the blue sky laws of Ohio, which requried full disclosure to CEC's shareholders of all aspects of the Evendale purchase. The Summary lists the major items of expense incurred by CEC in connection with the performance bonds and collateralizing the bonds as $ 65,000 paid to USF&G and $ 90,000 paid to a corporation controlled by Schott. The Summary does not list any amount associated with the Option, with the Warrants, or with a "bargain purchase" of the land and buildings as an expense incurred in connection with the performance bonds or providing collateral. After the close of CEC's first fiscal year (September 30, 1973) the Organizers, who were now the officers of CEC, discussed matters with their accountants and decided, for the first time, to treat the Option for redemption of Schott's stock as part of the performance bond expense and thus amortize it for Federal income tax purposes. At that time, CEC hired an appraiser to value the Option as of the Closing Date and began amortizing the appraised value *553 of the Option over the life of the contracts covered by the performance bonds. CEC did not treat the issuance of the Warrants or any "bargain purchase" on the land and buildings as an expense (in connection with the performance bonds or otherwise) for financial or Federal income tax purposes. When Shott learned of CEC's treatment of the Option for Federal income tax purposes, "he did not like it." By January 1974, CEC had settled a contract dispute which had arisen between the United States Government and Evendale. As a result of that settlement, CEC was to receive sufficient cash in early 1974 to fulfill its obligations under the Option. At the January 18, 1974, meeting of CEC's Board of Directors, Schott was asked if it were his intent to exercise his option in 18 months, and whether he was interested in an earlier exercise. He expressed an interest and the Executive Committee was directed to develop an offer for early redemption of the Shares. During the Board meeting, Schott also indicated his desire to transfer his remaining Warrants to vanden Eynden. The Board approved the proposed transfer of 466 Warrants from Schott to vanden Eynden and authorized waiver of the non-assignability *554 condition with regard to the Warrants. Schott rejected initial offers by CFC to repurchase the Shares for less than $ 78 per share. On March 25, 1974, Schott sold his remaining 466 Warrants to vanden Eynden for $ .10 per Warrant. The early repurchase of the Shares was completed on April 3, 1974, at a meeting of the Executive Committee of CEC. The final terms were carried out as follows: (a) CEC repurchased the Shares at $ 78 per share. The purchase price was paid in two installments ($ 800,026 on April 3, 1974, and $ 500,000 on August 15, 1974). (b) Schott granted CEC an option to purchase the land and buildings leased from Schott for $ 5,000,000. Schott also granted CEC a right of first refusal on that property. (c) CEC released Schott from his obligaton to provide the secondary line of credit. Schott resigned from CEC's Board of Directors that same day. On September 30, 1974, CEC repurchased the Warrants from vanden Eynden for $ 50 each. The Commissioner's notice of deficiency, dated March 1, 1978, and issued to the Estate of Harold C. Schott, determined a deficiency in petitioner's Federal income taxes for both the taxable year 1973 and the taxable year *555 1974. The Commissioner determined as to the taxable year 1973: (a) It is determined that during the tax year 1973, you received commissions and fees of $ 726,000 from Cincinnati Electronics Corporation that were not reported on your income tax return. Accordingly, your taxable income is increased $ 726,000. He determined as to the taxable year 1974: (a) In your income tax return for 1974 you reported a long-term capital gain from the sale of 16,667 shares of Cincinnati Electronics Corporation stock in the amount of $ 800,016. It is determined that $ 726,000 of the reported gain represents ordinary income from commissions and fees from Cincinnati Electronics Corporation. Accordingly, your taxable income is increased $ 726,000. Respondent filed an Amendment to his Answer, wherein he alleged: (e) The transactions discussed in subparagraphs 7(a) through 7(c) [Schott's participation in the CEC purchase of Evendale] were in substance a loan by Schott of moneys to CEC, and the receipt by Schott of interest income (Theory 1). (f) In the alternative, the transactions discussed in subparagraphs 7(a) through 7(c) resulted in substance in the performance of services by Schott, *556 and the receipt by Schott of compensation for services rendered (Theory 2). (g) In the alternative, the transactions discussed in subparagraphs 7(a) through 7(c) resulted in the receipt by Schott of ordinary income representing commissions and fees (Theory 3). Respondent further alleged in his Amendment to Answer: (k) Under Theories 1, 2, or 3, Schott's reported $ 800,016 gain is includable in 1973 and not 1974, and as ordinary income and not as capital gain. This results in a deficiency in income tax due from the petitioners for the taxable year 1973 in the amount of $ 560,011.20. This deficiency is $ 51,811.20 more than that stated in the statutory notice of deficiency for the year 1973. Respondent hereby claims an increased deficiency in income tax in the amount of $ 51,811.20 for the year 1973, under I.R.C. sec. 6214(a). Respondent alleged that this income is properly included in the taxable year 1973, but in the alternative argued for inclusion in the taxable year 1974. Subsequent to his Amendment to Answer, respondent filed a Second Amendment to Answer, wherein he alleged: (a) Certain negotiations between petitioners' decedent Harold C. *557 Schott ("Schott") and Cincinnati Electronics Corporation ("CEC") are described in paragraph 7 of respondent's first amendment to answer filed in this case on April 4, 1979. In addition to the option to compel CEC to repurchase his stock at a minimum profit of $ 800,016 (as described in paragraph 7), Schott bargained for and received the following benefits which were ordinary income to him: (1) A payment of $ 90,000 cash. This was paid in two installments in 1973 to Schott's controlled corporation, American National Corporation at Schott's direction. (2) A bargain in the amount of at least $ 410,000 on the purchase-leaseback of the land and buildings being used by CEC. (3) The right to purchase 666 warrants at $ .10 each. Each warrant entitled Schott for a period of five years to purchase one share of Class A stock at $ 30 per share. These warrants were redeemed by CEC for $ 50 each in 1974, for a total profit of $ 33,233.00. Respondent contends they had a value of $ 30,000 in 1973. (b) Schott failed to report as income either the cash, or the value of the bargain purchase, or the value of the warrants in either 1973 or 1974. (c) The cash, bargain on the purchase-leaseback, *558 and the warrants received by Schott were all in the nature of additional interest or loan fees, commissions, bonding premiums, compensation for services, or any combination of these, or other income taxable as ordinary income.
(d) The amounts described in subparagraph 8(a)(1), (2) and (3) should have been included in Schott's ordinary income in 1973, in the total additional amount of $ 530,000. Alternatively, if it is determined that the warrants did not have an ascertainable value in 1973, then the transaction remained open until the warrants were sold in 1974. In that event, the amount of $ 33,233 should be included as ordinary income to Schott for 1974. (e) Alternatively, if the warrants were not received as additional interest, fees, compensation or other ordinary income, they were taxable to Schott as gains from the sale of capital assets in the year or years in which they were transferred or redeemed. Respondent claimed increased deficiencies with respect to the allegations in his Second Amendment to Answer. ULTIMATE FINDING OF FACT The agreement between Schott and CEC was carefully negotiated and represents an arm's-length agreement between unrelated parties. The *559 economic reality of this agreement is that Schott made an equity investment in CEC pursuant to the formal terms of the agreement, purchased CEC's land and buildings at fair market value, and received the right to purchase CEC warrants at fair market value. OPINION The issues presented for our decision all emanate from the transactions between the decedent and CEC in 1973 and 1974. In amending his answer twice, respondent alleged that Schott received ordinary income either when he received the option to have his stock in CEC redeemed or when his stock was redeemed. In addition, respondent alleged that Schott received ordinary income from a bargain purchase of the land and buildings in 1973 and ordinary income upon the receipt of the right to purchase warrants to purchase CEC stock in 1973, or ordinary income or capital gain upon the disposition of such warrants in 1974. It is the position of respondent that the economic substance of the transactions between CEC and Schott did not conform to the form of the transactions used by them. He argues that the taxable events result in realization of ordinary income under several theories, i.e., interest, loan fees, commissions, bond *560 premiums, or compensation for services.
In the alternative, respondent determined that if the stock warrants had no ascertainable fair market value in 1973 when received by Schott that the transaction remained open until 1974 when Schott disposed of them and their sale resulted in ordinary income in 1974. Also, in the alternative, if the warrants were not received as ordinary income, their disposition in 1974 resulted in realization of capital gain.
Petitioner maintains that the economic reality of the transactions between the decedent and CEC coincides with the formal agreement and actions of them. A number of management employees of a portion of a division of Avco known as Evendale learned that Avco wanted to sell their portion of the company. They saw before them the opportunity of a lifetime. With the confidence of vision, they mortgaged their homes and future and began to piece together the many components that would be necessary to make the purchase and to set the new company upon a sound basis. They obtained an agreement in principle with Avco to purchase Evendale at net book value. Prior to beginning negotiations on an actual agreement, however, Avco required that *561 the Organizers provide it assurance (a) that they had arrangements in principle for sufficient financing to complete the proposed purchase and to carry on the business of Evendale and (b) that they make arrangements for appropriate novation agreements with the customers of Evendale which would be satisfactory to Avco. The Organizers lined up tentative sources of financing which would put them reasonably close to the amount of financing they expected to need, provided there were no unforeseen snags in the financing on the date of closing or on the basis of the finalized agreement. The inevitable snag which more often than not afflicts such business deals arose, however, in novation. The vast majority of the business that the Organizers hoped to acquire consisted of manufacturing under government contracts. The novation of these contracts proved extremely difficult. Novation of these contracts, under government regulations, required either that the new corporation, CEC, post performance bonds or that Avco remain secondarily liable for performance on the contracts. Avco refused to remain secondarily liable for CEC's performance so CEC had to seek performance bonds. These performance *562 bonds were not easily found.CEC was turned down by numerous surety companies. Thomas Klinedinst, president of an insurance agency and one of the people CEC used in its search for financing, was more encouraging. Although USF&G, a surety company which he represented, turned down CEC's initial request, he believed they would provide the needed bonds if there were additional equity capital invested in the corporation. The Organizers proposed, at that time, to provide equity of only $ 500,000 to $ 650,000 on total financing in the neighborhood of $ 10,000,000. With this encouragement, CEC sought additional capital. Mr. Klinedinst contacted Harold Schott, with whom he had had previous business dealings. Mr. Schott was initially primarily interested in acquiring CEC's land but did have extensive venture capital experience and appeared receptive to Klinedinst's proposal that he provide the additional capital that CEC needed. On December 28, 1972, after being given an inspection tour of the Evendale plant, Schott and two of his associates met with George Mealey, the head of the Organizers. Schott explained at this meeting that he would be willing to provide a significant amount of venture *563 capital but that he also wanted a sizable return on his investment within a few years. He also expressed interest in purchasing CEC's land and buildings which he would then lease back to CEC.In view of the high-leverage, high-risk nature of the proposed deal Schott wanted voting control, which was very possible as he was looking to provide almost one-half of all the equity capital that was needed. At the same time that the Organizers were negotiating with Schott, they were also exploring other possibilities for restructuring the financing of CEC.As with Schott, they found that such venture capital would be accompanied by a loss of control, contrary to their goals. On January 3, 1973, Avco notified the Organizers that it was terminating negotiations on the sale of Evendale as of the opening of business on January 8, 1973, unless all substantive problems in the transaction were resolved to Avco's satisfaction by that time. In previous negotiations CEC and Schott had discussed an equity investment by Schott with a repurchase agreement whereby Schott would have the option to cause CEC to redeem his stock at a set price during a specified period of time in the future. An equity *564 investment was chosen because USF&G rejected any form of investment by Schott other than common stock. CEC's attorney drafted a proposed agreement which he gave to one of Schott's associates on January 6. The parties met the following day. As part of the long and deliberate negotiations, Schott requested that the redemption price at which he could sell his shares back to CEC be increased to $ 1,300,000 from $ 1,000,000, to which Mealey agreed. An agreement was reached. Under the final agreement Schott did not have voting control. He was given two seats on the board of directors. In final form the terms of the agreement provided that: (a) Schott would fully collateralize, in a form satisfactory to the surety company, the performance bonds required to effect novation of Evendale's government contracts. The projected face of the performance bonds was approximately $ 7.5 million. CEC would pay the premiums for the performance bonds. (b) Schott would purchase the land and buildings (being acquired from Evendale) for $ 3 million and would lease them back to CEC for a period of 20 years under a net-net lease yielding a 12-percent annual return on the purchase price. The lease would *565 provide that Schott could sell (free from CEC's leasehold interest) that part of the land (approximately 39 acres) which was not being used in Evendale's operations as of the Closing Date. (c) Schott would purchase 16,667 shares of CEC common stock at a price of $ 30 per share (total price: $ 500,010). (d) CEC would grant Schott an option (the "Option"), exercisable between the 18th and 30th months after the Closing Date, to require CEC to redeem all or any portion of his shares at $ 78 per share. The Option applied only with respect to his shares and was not transferable by Schott. (e) Schott would provide a secondary line of credit in the amount of $ 500,000 to CEC for a period not to exceed 24 months, with interest at 1 percent over the prime rate. CEC would use its best efforts to increase the Bank's commitment to provide short-term credit from $ 500,000 to $ 1,000,000. (f) Schott and Eckert would be elected as two of the seven members of CEC's Board of Directors and would continue in that capacity until the last to occur of (1) expiration or termination of the performance bonds which Schott had collateralized or (2) expiration of the Option. (g) CEC would provide *566 an office for use by Schott and Eckert, part-time secretarial assistance to Schott and Eckert, a car for use by Eckert, and reimbursement of actual expenses incurred by Schott and Eckert on CEC business (up to $ 2,000 per month). After the January 7, 1973, agreement, negotiations on the performance bonds began. USF&G indicated that it would accept as security for the bonds either collateral or a personal indemnity from Schott. Klinedinst advised Schott to post collateral rather than act as an indemnitor because, so long as the collateral required was less than 100 percent, Schott would incur less risk. Schott became very angry when he learned that USF&G would require 100 percent collateral, which was much greater than he had been led to believe would be required. Klinedinst went back to USF&G and explained that Schott, who would of course be closely watching the operation because of his own personal exposure, was an experienced and astute businessman who had the financial and operational abilities and contacts to step in if CEC faltered. USF&G agreed to reduce the collateral requirement to 50 percent. Schott then went back to CEC requesting to be paid for the collateral he *567 was going to provide. After tough bargaining it was agreed that Schott would be paid $ 90,000 in installments and would be granted the right to purchase stock warrants at $ .10 per warrant. This was the same price at which all other shareholders purchased these warrants, a right which almost all of the shareholders exercised. The purchase and sale of Evendale was closed on March 9, 1973. Mr. Schott performed under the terms of the written agreement. The stock which was issued to Schott was identical with all other class A common stock issued by CEC. After the close of CEC's first fiscal year (September 30, 1973) the Organizers, who were now the officers of CEC, discussed matters with their accountants and decided, for the first time, to treat the option for redemption of Schott's stock as part of the performance bond expense and thus amortized it for Federal income tax purposes.Schott was not pleased. As the result of a contract dispute settlement, CEC had sufficient funds in January of 1974 to try to buy out Schott's interest in CEC. Although this was prior to the time the Option to redeem Schott's stock became effective, CEC negotiated with Schott to redeem his stock. *568 CEC redeemed his stock in April of 1974 at the price Schott could later require under the option agreement, i.e., $ 78 per share, and CEC also received an option to purchase its leased land and buildings together with a right of first refusal on Schott's sale of the property. Schott resigned from the board of directors that same day. We will begin our discussion of the issues with an examination of the burden of proof, which we find divided. The determination of the Commissioner as to a deficiency in tax is presumptively correct. Welch v. Helvering,290 U.S. 111 (1933). Accordingly, the burden of proof is generally on the petitioner to show that the Commissioner erred in his determination.The presumption applies, however, only to the determination contained in the statutory notice of deficiency. The burden of proof is on respondent as to any increased deficiencies or any new matter. Rule 142, Tax Court Rules of Practice and Procedure.[2]
Respondent asked for increased deficiencies in both an Amended Answer and a Second Amended Answer. Respondent concedes that he bears the *569 burden of proof as to increased deficiencies. The statutory notice of deficiency determined that Schott realized ordinary income in 1973 or 1974 and characterized that ordinary income only as "commissions and fees." Fees and commissions are two examples of compensation for services, as explained in section 1.61-2, Income Tax Regs.; therefore, the language used in the statutory notice embraces "compensation for services." We see no substantive difference in the use of these terms as they appear before us. Although it might appear possible that "compensation for services" is the broadest term and might encompass more than the term "fees and commissions" so that some part of its import is not included in the determination of the Commissioner, we see no grounds for such a conclusion here. Accordingly, the burden of proof is on petitioner to show that the Commissioner erred in his determination that Schott realized ordinary income from fees, commissions or compensation for services in 1973 or 1974. The-bargain-sale-of-land issue and the warrants issue are outside the statutory notice. Respondent does not argue otherwise. Respondent has the burden of proof regarding these new matters. *570 Petitioner contends that respondent bears the burden of proving that the decedent received interest income because that theory is new matter not contained in the statutory notice of deficiency. The respondent argues that the language of the statutory notice--"commissions and fees"--is broad enough to cover interest on the theory that a loan fee is interest. Respondent contends that this Court has used the words "interest" and "loan fee" interchangeably, citing Duncan Industries, Inc. v. Commissioner,73 T.C. 266 (1979). To begin with, that opinion does not involve confusion of the two words. In that case there were both loan fees and interest involved. The best support that respondent can hope for from that opinion comes from a footnote in which we suggest that a fee paid to obtain a loan is in the nature of interest.But this does not resolve the matter. The statutory notice must be read with a view to the plain meaning of the words therein. The respondent argues, concerning the compensation for services theory, that "commissions and fees" and "compensation for services rendered" are simply different words for the same concept and we agree. But these words *571 cannot suit respondent's purpose, like a chameleon which changes color. While a loan fee may be in the nature of interest, it is not the same thing. The respondent frequently argues that such a fee is for services and not interest. Indeed, respondent's interest theory is not one of a fee paid to obtain a loan but rather is one wherein the purchase of stock, coupled with an option for redemption, in substance, represented the loan of money to CEC with the stock being transferred as security for the obligation to repay the loan with interest.This would be interest in the trust sense. No stretch of the imagination would cause such interest to be commissions or fees. The respondent attempts to bootstrap his way by saying "fees" includes "loan fees" which may include "interest" so "fees" equals "interest." The argument falls of its own weight. The interest theory, raised by the respondent for the first time in an amended answer, does not simply narrow the issue raised by the notice of deficiency. It requires the presentation of entirely different evidence and is clearly new matter. Accordingly, respondent bears the burden of proof on this theory. Although there remains one further *572 dispute as to the burden of proof, our holding herein renders its resolution unnecessary. [3]
We will now consider the various alternative theories of respondent with respect to the option to redeem Schott's stock in CEC. Respondent argues that the only reason that CEC dealt with Schott was the corporation's desperate need for his collateral. Respondent suggests that it is questionable whether the terms of the agreement between Schott and CEC were negotiated at arm's length. Respondent further suggests that, in truth, the agreement was more like an adhesion contract in that Schott flatly stated the terms of the agreement *573 and CEC agreed to those terms. Respondent argues that Schott's purchase of the stock in CEC coupled with the redemption agreement was in substance an 18-month loan of $ 500,000 with guaranteed interest of $ 800,016. In the alternative, respondent argues that the redemption agreement was given to Schott as a "collateral fee," "bonding premium," commission or some other form of compensation for services. To support these arguments, respondent maintains that although the stock and redemption agreement were tied together, the redemption agreement had value in addition to and distinguishable from the value of the underlying stock. The thrust of respondent's argument is that the substance of Mr. Schott's participation in the Evendale deal resulted in his realization of ordinary income based upon one or another theory. The general rule that substance will control over form is well established in the judicial review of tax consequences. E.g., United States v. Phellis,257 U.S. 156, 168 (1921). By its very nature, the application of this rule requires a factual determination of the economic substance of the contract or transaction and must be made with a view to the *574 particular facts in each case. We have previously set forth the facts which we have found to be true and have also summarized the salient facts at the beginning of this opinion. Respondent's theories are based upon an interpretation of the facts at variance with our findings of fact. Much of this follows from respondent's reliance, at least for the purposes of this trial, on the position taken by CEC. Evaluation of the testimony of respondent's witnesses from CEC must be considered in light of the fact that many of them, as officers and stockholders of CEC, have a direct interest in the outcome of this case. Respondent's strongest witness, Mr. Mealey, and Chairman of the Board, President, Chief Executive and largest stockholder in CEC, is also the person who stands to gain or lose the most. CEC sought additional equity capital because it was thinly capitalized and the necessary performance bonds would not be issued without such additional equity. CEC investigated numerous sources of additional financing, and even as CEC negotiated with Schott it was negotiating with more than one alternative source of capital. Mr. Mealey and his associates were extremely competent and astute *575 businessmen, as demonstrated by their success in managing Evendale and thereafter acquiring and managing Evendale for CEC. Circumstances foced them to permit an outsider to take a significant equity position in their venture, but this was not to their liking and they bought out Mr. Schott at the earliest opportunity. During the negotiations with Mr. Schott, Mr. Mealey and associates possessed perhaps the most important card on the table: knowledge. Although blue books of financial information were prepared and updated, no one understands financial data better than the people who prepare it. [4] Mr. Schott's equity investment had to be very substantial in order to safisfy USF&G. Schott contributed nearly half of all the equity that went into the venture. Schott wanted control but he did not get it. Schott wanted to be able to liquidate his investment in the near future and proposed terms that were agreeable to the Organizers. The Organizers certainly would have preferred permitting this outsider a smaller share in the potential success of their venture, but they well knew that if things went according to plan this was really a small price to pay--the expected value of Schott's *576 stock during the option period was approximately $ 1.7 million while they expected to buy out this outsider for only $ 1.3 million. The parties carefully negotiated this Schott-CEC agreement, and we have found that this agreement represents an arm's-length agreement between unrelated parties. We will first consider the interest theory. Respondent's argument that Schott's stock purchase coupled with the redemption agreement was, in substance, an 18-month loan is not persuasive. The respondent directs our attention to the fact that early in the negotiations between CEC and Schott the parties considered various forms of Schott's participation in the venture including convertible debentures. Such preliminary negotiations are no evidence of the agreement that was actually reached, at least in the context before us. USF&G rejected any form of participation by Schott other than an equity investment. Respondent suggests that Schott's stock purchase *577 when coupled with the redemption agreement was a subterfuge to placate USF&G while in reality creating a debenture. [5] Respondent maintains that Schott received "guaranteed" interest because CEC was a sure bet. To say that Schott's investment was not subject to risk is to ignore reality. Subterfuge or not, Schott had an equity investment which under state law would not rate a high priority on liquidation. This risk is compounded by both the inherent risk of such venture capital investments and the highly leveraged capital structure of the CEC acquisition of Evendale. Neither do we find that Schott's investment was truly in the nature of a debenture as a result of this imagined subterfuge. On careful examination of the evidence, we conclude that in economic reality Schott did make an equity investment in CEC. Respondent seeks support from, among others, Comtel Corp. v. Commissioner,376 F.2d 791 (2d Cir. 1967), affg. 45 T.C. 294 (1965); and Green v. Commissioner,367 F.2d 823 (7th Cir. 1966), affg. a memorandum opinion of this Court. Substance versus form by its nature entails a determination based on the facts and circumstances *578 of each case. Any authority cited by the parties could at best provide this Court guidance, and this only when the attendant facts and circumstances are substantially similar. We do not find respondent's cited authority persuasive. In the above cited cases, in which redemption agreements were present, it was the "sellers" of the stock who had options to repurchase, as opposed to the purchaser of the stock in the instant case. In view of the attendant facts and circumstances in those cases, we found that the "sellers" had retained the beneficial ownership of the stock and had merely passed legal title to the taxpayers as a security device. We find petitioner's authority, although similarly not controlling, to be more persuasive. In both Zilkha & Sons, Inc. v. Commissioner,52 T.C. 607 (1969), and Ragland Investment Company v. Commissioner,52 T.C. 867 (1969), affd. per curiam 435 F.2d 118 (6th Cir. 1970), we found preferred stockholdings with significant investment protection to be equity and not debt. Notwithstanding this investment protection, in Zilkha & Sons, we stated that: *579 * * * despite the unusual protection given the petitioners, we have concluded that the arrangement more resembles the acquisition of stock rather than the making of a loan. Primarily, we are led to this conclusion because ot the parties' treatment of the transaction, and because the petitioners have assumed the risks of investors in equity. [52 T.C. at 612, 613.] This analysis applies and we note that neither party to the CEC-Schott transaction ever treated the transaction as a loan. We will now consider the theory that the benefits accruing to Schott were for his providing equity and collateral.Our examination of the economic substance of Mr. Schott's participation in the Evendale deal does not reveal that he received the redemption agreement as a "collateral fee," "bonding premium," commission or some form of compensation for services. CEC needed equity in order to obtain performance bonds and he provided it. At the time the parties entered into the agreement defining Schott's participation in the venture it was far from clear that Schott would be required or would choose to do more than guarantee the performance bonds.The guarantor of a note or similar *580 instrument is not ordinarily considered to be the recipient of compensation income for performing personal services. When it was later determined that Schott would provide collateral, the parties had a second round of negotiations at which time Schott asked for and received $ 90,000 as compensation for providing collateral. Both parties agree that this $ 90,000 represents ordinary income to Schott. In arguing that Schott was paid more than this $ 90,000 to provide equity and collateral, respondent places great weight on the fact that CEC agreed to redeem Schott's CEC stock. We learned from the cross examination of respondent's first witness, Donald Huckins, who was one of the original organizers of CEC, that all minority shareholders had agreements with CEC under which CEC would redeem their stock. Although the terms of Schott's redemption agreement were negotiated separately from those of the other minority shareholders and differ from these other agreements in its terms, the existence of the Schott redemption agreement does not appear unusual in this light. The existence of the Schott redemption agreement was not only not unusual in the circumstances, but if further explained *581 by the fact that the Organizers were not pleased with having Schott or any other outsider as a partner sharing in their future. They bought him out at the earliest opportunity. We find that Harold Schott's purchase of CEC stock, coupled with the nontransferable right to cause CEC to redeem this stock under certain terms, was neither in economic substance a loan nor compensation for services, however described. Accordingly, we find that the decedent, Harold Schott, did not realize ordinary income either upon receipt of the option to have his stock in CEC redeemed or upon the redemption of this stock. Respondent relies heavily on his contention that the redemption agreement had value in addition to and distinguishable from the value of the underlying stock. We, therefore, feel compelled to comment thereon. The parties to the agreement ascribed no value to Schott's right to have his CEC stock redeemed. Much of the opinion of respondent's expert witness who valued the "put" [6] is based upon comparison to publicly traded put options. [7] While the analogy is attractive because of the common use of the term "put," the opinion offered by respondent's expert witnesses does not convince *582 us that the valuation analogy is applicable in light of the facts of this case. Unlike our facts, publicly traded put options are purchased by investors who do not own the underlying, publicly traded securities. Such publicly traded put options, unlike Schott's redemption option, are backed by an escrow deposit so that there is no risk that the issuer of the option will have insufficient funds to perform. Finally, Schott's option to require CEC to redeem his shares was expressly nontransferable. In context, however, all of the above is but determinative of the valuation of Schott's basis in his stock. The option was exercised in 1974 and the stock was redeemed in 1974; therefore, even if respondent's evidence were more persuasive, it would not by itself change our holding herein. *583 We will now consider the bargain purchase and warrants issues. Respondent argues that the bargain purchase of the real estate was part of the total package required to obtain Schott's collateral. Respondent further argues that Schott received the right to purchase the warrants as part of the "bonding premium" so that Schott realized ordinary income either upon the receipt of these warrants or upon their subsequent transfer or redemption. Although respondent presented an alternative position in his Second Amendment to Answer that the bargain purchase and receipt of warrants represented additional interest income, respondent, in his briefs, did not present any arguments to support this theory. Respondent argues that Schott received a bargain on his purchase of CEC's land and buildings as part of his compensation for providing equity and collateral. In his search for the fair market value of the land and building involved, respondent has rejected the evidence of what we have found to be the arm's-length purchase of this real property by Schott. We consider as evidence the fact that CEC had lined up a tentative purchaser for this same real property at a higher price. We also consider *584 as evidence the significantly lower price at which CEC purchased this real property from Avco. Respondent presents the testimony of Mr. Mealey as evidence that Schott received this bargain purchase in exchange for providing collateral. Mr. Mealey's testimony does not directly support respondent's position. In that testimony Mr. Mealey, respondent's witness, answered a leading question which assumed that CEC sold the land and buildings to Schott at a bargain price. In addition, we do not find the testimony of Mr. Mealey to be credible, in view of his interest in this matter and our observation of his demeanor as a witness. It is well settled that the fair market value of property is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both reasonably informed as to all relevant facts. [8]Jack Daniel Distillery v. United States,180 Ct. Cl. 308, 379 F.2d 569, 574 (1967). As we explained in VGS Corp. v. Commissioner,68 T.C. 563 (1977), the best evidence of such value results from arm's-length bargaining which comports with economic reality. We find *585 that the valuation accorded this real property by CEC and Schott is such a value. We are not persuaded by respondent's argument that this valuation was determined under compulsion, as we do not so view the facts. Finally, respondent argues that Schott received ordinary income either on the receipt or subsequent transfer of the warrants. CEC paid USF&G $ 65,000 to provide the performance bonds. It paid Schott $90,000 to put up the collateral. The essence of respondent's argument is that Schott received the right to purchase the warrants at the same time that he was paid $90,000 to provide collateral, so that the receipt of the right to purchase these warrants must represent additional "bonding premium." The warrants which Schott purchased were held by almost all of the CEC shareholders. Schott paid the same price for these warrants as did every other shareholder. These rights were no more valuable to Schott than they were to any other shareholder. Respondent suggests that the parties had an unwritteen "gentlemen's agreement" that the warrants purchased by Schott would be later redeemed at a set *586 price. Respondent originally argued that this price was $ 30,000 but later maintained that it was $ 20,000. We find this arrangement surprising, given the parties' demonstrated attention to detail and practice of reducing this detail to writing, and given the fact that there was no love lost between Schott and Mealey; indeed we find that respondent's evidence of this "gentlemen's agreement," coming from the testimony of Mr. Mealey himself, lacks credibility. Respondent has presented no convincing evidence that these warrants had a fair market value greater than the price at which Schott purchased them, either at the time he received the right to purchase them or later when he transferred them to vanden Eynden. We, therefore, find that neither the receipt by Schott of the right to purchase warrants nor the subsequent transfer or redemption of these warrants resulted in the realization of income by the decedent, Harold Schott. In view of the foregoing, we find that petitioner has borne its burden of proof as to the commissions and fees and compensation for services theories regarding the first issue and respondent has failed in his burden on all other issues. In view of our review *587 of the evidence we would not find for respondent on the interest theory even if petitioner bore the burden of proof thereon. Because of concessions by the parties, Decision will be entered under Rule 155.
Footnotes
1. A "net-net" lease is one in which the tenant pays all operating expenses, maintenance costs, insurance, real estate taxes, etc.; such a lease is also referred to as a "100-percent-net" lease.↩
1. These figures do not include amounts paid for warrants.↩
2. All references to Rules are to the Tax Court Rules of Practice and Procedure.↩
3. The petitioner maintains that respondent should be held to a burden of strong proof because he is challenging the form of a transaction negotiated at arm's length between unrelated parties who have adverse tax interests, citing numerous opinions of this Court including Ragland Investment Co. v. Commissioner,52 T.C. 867, 878-879 (1969), affd. per curiam 435 F.2d 118↩ (6th Cir. 1970). The respondent maintains that the strong proof rule never applies to respondent, who is free to accept or challenge the form of a transaction.
4. The Organizers testified that this inside knowledge of the underlying strengths and weaknesses of the financial data was critical to their negotiations with Avco. We find it no less important in their negotiations with Schott.↩
5. A debenture is a writing or certificate issued as an evidence of debt.↩
6. Although we have given the fact no weight, we note that while one of respondent's expert witnesses insists that Schott's option is a "put" the other insists that it cannot be. Also, after holding our breath for some considerable time we found this option to be inevitably referred to as a "Schott put." ↩
7. A "put" is an option that gives the holder the right to sell a fixed amount of stock within a specified time and at a specified price. Puts are purchased by investors who think the stock price may fall.Standard & Poors, A Glossary of Financial/Investment Terms.↩
8. Moss American, Inc. v. Commissioner,T.C. Memo. 1974-252↩.